Alex A. POMIERSKI, Plaintiff,

v.

W. R. GRACE & CO., Defendant.

No. 66 C 2420.

United States District Court
N. D. Illinois, E. D.

Dec. 29, 1967.

---

3. Rains v. Cascade Industries, Inc., 269 F. Supp. 688, 695 (1967).

Alfred B. Teton, Froelich, Grossman, Teton & Tabin, and Richard F. Watt, Cotton, Watt, Jones & King, Chicago, Ill., for plaintiff.

James A. Velde and Thomas W. James, Gardner, Carton, Douglas, Chilgren & Waud, Chicago, Ill., for defendant.

### MEMORANDUM OPINION

DECKER, District Judge.

This is an action in three counts brought by a warrant holder in Walnut Grove Products, Inc., an Iowa corporation. Defendant W. R. Grace & Co. is a Connecticut corporation which purchased the assets and assumed the liabilities of Walnut Grove. Walnut Grove is a small company engaged principally in the manufacture of livestock and poultry feeds, while the Grace Co. is much larger and widely diversified. The central issue involved here is whether or not the purchase of Walnut Grove's assets terminated plaintiff's right to exercise his warrants.

On July 16, 1964 Grace entered into an "Agreement and Plan of Reorganization" with Walnut Grove. This provided for the sale to Grace of the assets of Walnut Grove in exchange for shares of Grace common stock. Grace also agreed to assume substantially all the liabilities of Walnut Grove. Walnut Grove agreed to call a stockholders meeting by August 10, 1964 for the purpose of adopting voluntarily the Iowa Business Corporation Act, 28A, 28B Iowa Code Ann. ch. 496A. Another stockholders meeting on August 31 was to be called for the purposes of authorizing the following: The sale of assets to Grace, the voluntary dissolution of Walnut Grove following distribution to the stockholders of the Grace stock in complete liquidation of Walnut Grove, and an amendment of the articles of incorporation to change the name of Walnut Grove.

Under the terms of the agreement, one share of Grace common stock was to be issued for each three shares of Walnut Grove common stock outstanding at the time of the closing, which was set for October 1, 1964. Walnut Grove also was required by the agreement to take the necessary steps and give the required notices to cause the right to exercise outstanding warrants to purchase stock in Walnut Grove to expire at the close of business on the third full business day before the closing. The number of warrants outstanding as of July 16, 1964 was 143,505, which entitled the holders to purchase 172,206 shares of Walnut Grove common stock. These warrants were governed by the terms of a "Stock Warrant Agreement" executed by Walnut Grove and the Omaha National Bank on February 1, 1960.

Plaintiff had purchased fifty warrants evidenced by a Warrant Certificate dated March 24, 1960. His warrants were subject to the terms of the Warrant Agreement and allowed him to purchase shares of Walnut Grove up to March 1, 1970 at a specified price which would increase at designated times in 1964 and 1967. Paragraph 3(a) of the Warrant Agreement provides that warrants can be exercised up to March 1, 1970

> "except that if notice has been given as provided in Section 8(c) in connection with a *distribution in a liquidation, dissolution or winding up of the Company,* the right to exercise Warrants shall expire at the close of business on the third full business day before the record date specified in such notice. Any Warrant not so exercised shall become void, and all rights thereunder shall cease." (Emphasis added.)

Paragraph 8(c) requires notice to be given to each warrant holder thirty days prior to the record date for any distribution on Walnut Grove common stock.

It is apparent that the reorganization agreement contemplated that the warrant holders' rights would be subject to the above provisions of Paragraph 3(a) of the Warrant Agreement, including the notice of Paragraph 8(c). Defendant's principal contention in this case is that these provisions effectively governed, and were complied with, so as to terminate the rights of all warrant holders who did not exercise their warrant rights before the cut-off date. Defendant claims that there was a lawful "distribution in a liquidation, dissolution or winding up of the Company," so that Paragraph 3(a) was controlling of warrant holders' rights.

The meetings of August 10 and August 31 were held as set forth in the reorganization agreement. At the latter meeting, the shareholders of Walnut Grove approved by more than two thirds affirmative vote both the sale of assets for stock of Grace and the liquidation and dissolution of Walnut Grove. On August 31 a "Notice of Expiration of Warrant Certificates" was sent to plaintiff and all other warrant holders, indicating the actions which had been taken by the stockholders and pointing out that October 1 was the record date for the determination of holders of stock entitled to receive the liquidating distribution in shares of Grace stock. This notice expressed that, pursuant to Paragraph 3 (a), warrants unexercised at the close of business on September 28 would become void.

In accordance with the August 31 notice, and the reorganization plan, holders of 140,660 warrants exercised their rights prior to the cut-off date. They received rights in 168,792 shares of Walnut Grove common stock, on which they received 56,264 shares of Grace stock in accordance with the distribution provisions of the Warrant Agreement and the July 16 reorganization agreement. Plaintiff was the holder of 50 of the 2,845 warrants which were not exercised before September 28, 1964. On October 1, 1964, the reorganization was consummated in accordance with the plan. Shortly thereafter the Grace shares were distributed to Walnut Grove stockholders. The dissolution of Walnut Grove, however, has not yet been formally completed.

Plaintiff contends here that the transaction was "in fact and in law" a merger or consolidation. Accordingly plaintiff argues that the rights of warrant holders were governed not by Paragraph 3(a) but by Paragraph 6 of the Warrant Agreement. Paragraph 6 provides that in the event of a reclassification, change, merger, or consolidation, the shares purchasable by the warrant holder shall

> "consist of the kind and amount of securities or property, if any, which would have been received by the Warrant holder if on the effective date of such reclassification, change, merger or consolidation he had been the holder of record of the Current Stock Unit receivable by him upon exercise of his Warrant immediately prior to such effective date."

This means, of course, that in the event of a merger of Walnut Grove with another company, the rights of the warrant

holder were to continue, allowing him the opportunity to purchase shares of the corporation surviving the merger. Plaintiff claims that this is what has occurred, so that each holder of warrants was entitled to retain his option to purchase until March 1, 1970. He would be entitled to purchase shares of Grace, however, instead of shares of Walnut Grove.

The issue, then, has been joined clearly: Defendant claims that the transaction was a lawful sale of assets and a liquidation in dissolution of Walnut Grove, all in accordance with the applicable provisions of Iowa statutory law, and that the notice given by Walnut Grove effectively terminated plaintiff's warrant rights. Plaintiff claims that a merger was consummated which is subject to Paragraph 6 of the Warrant Agreement, providing for the continuation of plaintiff's warrant rights until March 1, 1970.

Count I of the complaint is founded upon diversity of citizenship, as plaintiff is a citizen of Illinois and defendant is a Connecticut corporation. There is a substantial question as to whether or not the actual amount in controversy exceeds $10,000, for the total value of plaintiff's warrants is no more than $800. The *action is brought, however, as a class* action under Rule 23, Fed.R.Civ.P., on behalf of plaintiff and all other holders of warrants in Walnut Grove who failed to exercise their rights at the time of the pending sale of the company's assets. Also included in the class plaintiff claims to represent are those warrant holders who did exercise their rights prior to September 28, 1964. Plaintiff's attempt to cast this action as a class suit has raised not only the question of whether the jurisdictional amount has been met and of whether the class members' interests can be aggregated so as to meet the amount required, but also has presented the issue of whether or not plaintiff can adequately represent both warrant holders who did and those who did not exercise their rights. The relief sought by plaintiff under Count I is the recognition and enforcement of continu-

ing warrant rights for him under the terms of Paragraph 6 and other portions of the Warrant Agreement.

Count II is also brought as a class action, based upon the same facts relevant to Count I. It is founded upon Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), which declares it unlawful for any person, directly or indirectly,

> "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Plaintiff contends that the notice of August 31, 1964 falls within this statutory prohibition.

Court III alleges the same facts and is brought under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q (a), which declares it unlawful for any person in the offer or sale of any securities, directly or indirectly

> "(1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

The notice of August 31, 1964 is assailed under this provision as well. Under both Counts II and III plaintiff seeks the same relief prayed for in Count I, along with other damages.

*Defendant has filed its answer to the complaint.* The answer admits the prin-

cipal facts regarding the reorganization agreement, the stockholders' meetings, the notice to warrant holders, etc. The legal significance attributed to these facts by plaintiff is denied, and the validity of the class action is also denied by defendant. Defendant also has filed a motion for judgment of dismissal on the basis that no diversity jurisdiction is present, the class action is improper, and plaintiff has failed to set forth a cause of action under any count on which relief can be granted.

In support of the motion to dismiss, defendant filed a number of affidavits alleging certain facts which do not appear from the pleadings. In accordance with Rule 12(b), Fed.R.Civ.P., the motion will be treated as a motion for summary judgment. It appears to me that the facts, as stated above, are not in dispute in any material respect. There thus being "no genuine issue as to any material fact," · Rule 56(c), Fed.R.Civ.P., the only question is whether defendant is entitled to a judgment as a matter of law.

*I. Diversity Jurisdiction under Count I.*

Defendant's first ground for dismissal of Count I is that plaintiff has failed to establish the jurisdictional amount of $10,000 required for a diversity suit, under 28 U.S.C. § 1332. It is clear that the total value of plaintiff's individual interest in the subject matter of this suit is no more than $800. Plaintiff urges, however, that he is entitled to aggregate the interests of all other warrant holders included in the class plaintiff claims to represent by virtue of Rule 23, Fed.R. Civ.P. If this aggregation is proper, plaintiff has established the jurisdictional amount.

The same issue was presented to me in plaintiff's earlier suit on the same subject matter (No. 65 C 1281). In that action I granted the defendant's motion to dismiss for failure of plaintiff to reach the jurisdictional amount required for a diversity suit. I found that aggregation of the interests of the persons plaintiff sought to represent was not proper under the former version of Rule 23. At that time I stated,

"Although all members of the class derive their rights from a common agreement and similar warrant certificates, and although the result here may have some impact on the interests of other members of the class, the fact remains that plaintiff's rights stand alone. He can sue without joining other warrant holders; a judgment in this suit is not binding upon warrant holders who do not join as plaintiffs. A class suit of this type is nothing more than a permissive joinder device, and the value of the claim for purposes of reaching the jurisdictional amount depends entirely on the parties actually present in court."

Plaintiff, at the time of that decision, pointed out that Rule 23 was soon to be in effect in an amended form which might alter the result I should reach on the aggregation question. I indicated in my decision that the impact of the new Rule 23 was "a question for another day." That day has now arrived.

Plaintiff now urges that inasmuch as a judgment in a class suit under the new Rule 23 is binding upon all members of the class, except for those who expressly choose to be excluded from a suit under Rule 23(b) (3), the relevant jurisdictional amount is the total of the interests of all members of the class. Plaintiff considers it now unnecessary to examine the nature of the claim, as was done under the old Rule, and instead appears to assert that any properly maintainable class action under Rule 23 is automatically entitled to aggregation of the class members' interests.

This same argument was considered and rejected in the case of Alvarez v. Pan American Life Insurance Company, 375 F.2d 992 (5th Cir. 1967). Considering the new form of Rule 23, the court found that it

"does not abrogate the well settled principle that separate and distinct claims may not be aggregated to make

the jurisdictional amount even in a class action." Id. at 993.

The court also said,

"[T]he question of jurisdictional amount still exists unless the new rule has somehow abrogated the aggregation principle. We have found no authority for so holding, and we cannot assume that federal jurisdiction has been expanded in such a *sub silentio* manner." Id. at 995.

The significance of the *Alvarez* decision is that it makes clear that changes in the procedural device which we find in Rule 23 do not change the substance of a litigant's right to federal jurisdiction.

■ Rule 82 states that the Rules of Civil Procedure "shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue therein. * * *" In another recent case, the new Rule 23 was considered in relation to Rule 82.

"[A] construal of the amended Rule 23 in such a way as to confer jurisdiction on this court where in a similar situation before the amendment to the rule it would not have had jurisdiction, would constitute a direct violation of Rule 82 * * *." Snyder v. Harris, 268 F.Supp. 701, 704 (E.D.Mo.1967).

If I were to accept plaintiff's position regarding aggregation, I would be acting in violation of Rule 82 and of well-established precedents indicating the importance of the nature of the interests asserted in a class action when aggregation is sought. See, e. g., Matlaw Corp. v. War Damage Corp., 164 F.2d 281 (7th Cir. 1947); Koster v. Turchi, 79 F.Supp. 268, 273–274 (E.D.Penn.1948), aff'd 173 F.2d 605 (3rd Cir. 1949); Vine v. Beneficial Finance Co., 252 F.Supp. 212 (S.D.N.Y.1966), rev'd in part 374 F.2d 627, 637 (2d Cir. 1967).

In my decision in the earlier case between the present parties I analyzed the nature of the plaintiff's interest and those of the class he purports to represent. I concluded that those interests did not justify allowing aggregation, and I cannot find that the new Rule has

changed the nature of those interests. As an additional reason why this determination should not be altered, it must be noted that the principles which have heretofore governed the question of aggregation in class actions have also applied in non-class suits involving multiple plaintiffs. See Clark v. Paul Gray, Inc., 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939). If I were to hold that aggregation in a class suit is dependent solely upon compliance with Rule 23, that would create one rule for aggregation in class suits and a different rule in ordinary, multiple plaintiff actions involving the same type of claims.

■ In my opinion, Rule 23 has not changed the doctrine that separate and distinct claims may not be aggregated to reach the jurisdictional amount. Plaintiff's $800 claim is separate and distinct from the claims of other warrant holders and is insufficient to establish diversity jurisdiction. Consequently, Count I must be dismissed.

*II. Class Action under Counts II and III.*

Counts II and III of the complaint are founded upon the Securities Exchange Act of 1934 and the Securities Act of 1933, respectively. These statutes do not require a jurisdictional minimum amount, so the aggregation problem does not arise as to them. Defendant argues, however, that the class action which plaintiff is attempting to bring under these counts is not completely a proper one under Rule 23(a) (4). Defendant's objection is that plaintiff is actually attempting to represent two separate classes—the small group of holders of warrants who did not exercise them at any time and the much larger group of holders who did exercise them after the notice of August 31 was given and before the cut-off date of September 28, 1964.

Rule 23(a), Fed.R.Civ.P., reads as follows:

"One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of

all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) *the representative parties will fairly and adequately protect the interests of the class.*" (Emphasis added.)

Defendant claims that the interests of the former warrant holders who are now owners of stock in defendant are different from and antagonistic to the interests of plaintiff. Consequently, defendant urges that plaintiff will not "fairly and adequately protect" the interests of those persons.

Specifically, defendant points out the following respects in which plaintiff's interests differ from the interests of the warrant holders who acted upon Walnut Grove's notice of August 21, 1964: First, the relief plaintiff seeks would seem to require those persons to give up the stock they obtained after exercising their warrants. Some of these persons probably would not be in a position to do so, even if they wanted to, because the stock may have been sold by them or otherwise transferred from their control. In order for stock to be retained or repurchased by them, the applicable warrant price would be the higher, post-1967 price under the terms of the Warrant Agreement. As a further complicating problem, some provision would have to be made for the return or crediting of dividend payments with necessary tax adjustments.

■ In these and other respects plaintiff's interests appear to be in conflict with the interests of the great majority of the persons plaintiff claims to represent. In Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), the Supreme Court held that there had not been adequate representation in a state court class action by some of the signers of a racially restrictive covenant for the use of land. Those signers had sued in an attempt to enforce the covenant. Their interest in enforcing it was contrary to the interest of signers who later sought to resist its enforcement, so the latter could not be bound by the previous suit. Similarly, in the present case, the persons who took advantage of the final period for exercise of warrant rights cannot be considered adequately represented by persons who did not benefit at all from the warrants they held. As the Court said in *Hansberry,*

"It is one thing to say that some members of a class may represent other members in a litigation where the sole and common interest of the class in the litigation, is either to assert a common right or to challenge an asserted obligation. It is quite another to hold that all those who are free alternatively either to assert rights or to challenge them are of a single class, so that any group merely because it is of the class so constituted, may be deemed adequately to represent any others of the class in litigating their interests in either alternative. Such a selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those whom they are deemed to represent, does not afford that protection to absent parties which due process requires." Id. at 44–45, 61 S.Ct. at 119. (Citations omitted.)

Such representation certainly does not satisfy Rule 23's explicit requirement of fair and adequate protection of the interests of all members of the purported class. See also Advertising Specialty National Association v. Federal Trade Commission, 238 F.2d 108, 119 (1st Cir. 1956) (Magruder, J.).

■ The new broadly binding effects of Rule 23 in its amended form make the adequate representation issue "considerably more significant." Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147, 150 (S.D.N.Y.1966); Fischer v. Kletz, 41 F.R.D. 377, 383 (S.D.N.Y.1966). Considering this, the relative smallness of plaintiff's interest adds further doubt as to the adequacy of the representation he will provide. There is absolutely no indication that the persons who exercised

their warrants wish to be represented by plaintiff. The relief which he seeks for himself may well be undesirable for the great majority of warrant holders who made the decision to obtain the Grace stock. In this situation, these persons should not even be required to resort to the request for exclusion from the class action provided by Rule 23(c) (2). Consequently, the plaintiff's class actions under Counts II and III must be limited to a representation of persons, such as plaintiff, who held warrants but did not exercise them prior to the cut-off date.

*III.   Causes of Action under Counts II and III.*

Counts II and III of the complaint can only survive the motion to dismiss if the facts alleged bring the plaintiff's case within the terms of the statutes relied upon. For example, the question is whether it can be shown on the present facts that defendant was responsible for and profited from an "untrue statement of a material fact or [an] omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a) (2). Other phrases in the statutory sections relate to "any device, scheme, or artifice to defraud," id., "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser," id., and "any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j (b). It is clear that none of these statutory provisions will be of avail to plaintiff if the transaction complained of was, in fact and in law, what it was called by defendant and Walnut Grove in the various documents and notices involved, particularly in the "Notice of Expiration of Warrant Certificates" of August 31, 1964. In other words, if the transaction was a lawful sale of assets followed by a distribution in liquidation of the selling corporation as part of a plan of dissolution, there has been no statutory deception of plaintiff.

We must examine the status of transactions of this nature under Iowa law in order to resolve this issue. The applicable statutory provisions are in the Iowa Business Corporation Act, 28A, 28B Iowa Code Ann. ch. 496A, which Walnut Grove's shareholders voluntarily elected to adopt, pursuant to § 496A.142, on August 10, 1964. The main, relevant features of the Act are as follows: The procedure for merger is set forth in § 496A.68. Approval by "the affirmative vote of the holders of at least two-thirds of the outstanding shares" is required by § 496A.70. The effects of a merger are spelled out in § 496A.73.

Section 496A.76 authorizes the sale of all or substantially all of a corporation's assets outside of the regular course of business, with the approval of at least a majority of the outstanding shares entitled to vote. Sections 496A.77, 496A.78 acknowledge the right to dissent and to payment of the fair value of shares for stockholders who dissent from any plan of merger or consolidation or from any sale or exchange of all or substantially all of the corporate assets. It is important to note that this "appraisal right" now attaches in Iowa for the benefit of stockholders dissenting from either mergers or sales of assets. This was not true under the prior Iowa corporation law, 28 Iowa Code Ann. ch. 491.

Finally, the voluntary dissolution of the corporation may be effected pursuant to § 496A.81 by the resolution of the board of directors and "the affirmative vote of the holders of a majority of the outstanding shares of the corporation entitled to vote upon the question of dissolution."

All of the actions taken by Walnut Grove in order to carry out the plan of reorganization of July 16, 1964 were taken pursuant to the new statutory provisions, the Business Corporation Act. The notice of the August 10, 1964 shareholders meeting indicated that a majority vote was to be required for adoption of the Business Corporation Act. The notice for the August 31 meeting, and the proxy statement for the August 10 meeting, indicated that an affirmative ma-

jority vote would constitute approval of the sale of assets. The dissolution proposal, however, was stated as requiring a two-thirds vote. This requirement was considered applicable under the terms of Walnut Grove's Articles of Incorporation, although the statute, § 496A.81, only requires a majority. The notice also declared that the sale of assets was conditioned upon the approval of the dissolution proposal, so in effect a two-thirds vote was required for both the sale and the dissolution proposals. In fact, both of these proposals received considerably more than two-thirds approval.

Thus the transaction was carried out in conformity with the applicable statutory provisions on sales of assets and dissolutions, as plaintiff concedes. On the face of the transaction there was no "merger" and the provisions of paragraph 6 of plaintiff's warrant contract, relating to his rights in the event of a merger, could not apply. Consequently, if following the statutory procedure was enough, then the notice of August 31, 1964 was not deceptive or misleading by omission or otherwise, and plaintiff would not be entitled to relief under either the Securities Act of 1933 or the Securities Exchange Act of 1934.

Plaintiff contends, however, that the statutory form of the transaction is not completely controlling. He argues that if in substance a merger has occurred, plaintiff's warrant rights could not have been terminated by the notice which was given in 1964. What plaintiff is seeking to apply in this argument in order to protect his rights as a warrant holder is the de facto merger doctrine.

I find no reported cases in Iowa, or elsewhere, in which the rights of a warrant holder were considered in relation to the de facto merger doctrine. Almost all of the cases appear to deal with rights of the stockholders in either the selling or the purchasing corporation. Rath v. Rath Packing Co., 257 Iowa 1277, 136 N.W.2d 410 (1965); Applestein v. United Board & Carton Corp., 60 N.J.Super. 333, 159 A.2d 146 (1960); Farris v. Glen Alden Corp., 393 Pa. 427, 143 A.2d

25 (1958); Cf., Heilbrunn v. Sun Chemical Corp., 38 Del.Ch. 321, 150 A.2d 755 (1959). In fact it appears that the purpose of the de facto merger doctrine has been principally, and perhaps solely, to protect the interests of stockholders who dissent from a transaction which ultimately produces the same result as a merger. The type of protection which has been at issue is the "appraisal right," the right to have one's stock purchased at fair value by the corporation itself. Originally this right derived from certain common law principles:

"The courts generally held at common law that unless a corporation was failing, a sale of all its assets for cash or securities would be enjoined or set aside on the application of even one shareholder, on the theory that each shareholder had a contractual right to continue in the enterprise as originally chartered and, furthermore, that he might not be compelled to invest in a business other than the one to which he originally subscribed." Note, "The Right of Shareholders Dissenting from Corporate Combinations to Demand Cash Payment for their Shares," 72 Harv.L.Rev. 1132, 1133 (1959).

"[T]he appraisal right is given to the stockholder in compensation for his former right at common law to prevent a merger." Heilbrunn v. Sun Chemical Corp., supra, 150 A.2d at 758.

"De facto merger is invoked primarily to extend the right of appraisal to dissenting shareholders to whom it would not otherwise be available." Comment, "Exchange of Stock for All Assets Followed by Dissolution Constitutes a De Facto Merger," 51 Iowa L.Rev. 1096, 1097 (1966).

The Supreme Court of Iowa seems to subscribe to this interpretation of the derivation and purpose of the appraisal right concept. In Rath v. Rath Packing Company, supra, the court said,

"At common law no merger could take place without unanimous consent of the stockholders. However, statutes

in all jurisdictions now authorize mergers upon a vote of less than all stockholders. A shareholder who dissents to a merger may obtain the value of his stock if the right thereto is provided by statute, if procedure is established therefor and is followed by him." 136 N.W.2d at 415.

In *Rath* the court held that the dissenting stockholders of the *acquiring* corporation, in a stock-for-assets transaction amounting in effect to a merger, could not be deprived of their appraisal rights just because the transaction was cast as an amendment of the corporate articles and an issuance of additional stock, rather than as a formal merger. It must be noted that the issue in *Rath* was not whether the de facto merger doctrine was necessary in order to protect the rights of shareholders under a statutory sale of assets followed by a liquidation and dissolution. The statuory sale route had not been chosen by the corporation in that case, and even if it had been used, Rath shareholders would not have been protected because the Iowa statute only affords appraisal rights to the selling corporation's shareholders.

■ *Rath* thus does not answer the question posed by the present case, the question of whether the de facto merger doctrine is still viable in Iowa to protect the selling corporation shareholders or warrant holders in the event of a statutory sale and dissolution. It appears to me, however, that inasmuch as the Iowa Business Corporation Act now provides for appraisal rights on either a sale of assets or a merger, the doctrine is no longer necessary in Iowa law for the protection of stockholders in a selling corporation. Iowa now seems to allow a reorganization with the practical effects of a merger to be undertaken either by the statutory merger method or by the statutory sale of assets and dissolution method.

■ It is true that a difference continues to exist in the size of the affirmative vote of stockholders required for approval, being two-thirds for a merger and only a majority for a sale and a dissolution. This difference, however, does not appear to have been a substantial basis for the de facto merger doctrine heretofore, and I do not think it should become such now. The appraisal right was protected by the courts through the de facto merger doctrine on the basis of the stockholder's personal right at common law to prevent a sale of assets which would work a change in the basic nature of his investment. This was an individual interest which was at stake: By allowing the stockholder the right to have his shares purchased by the corporation, he was given some financial protection for his investment—the freedom to terminate his investment without taking a loss—even though the unanimity rule had been left behind. Because unanimity has been dispensed with and because the appraisal right for the stockholder in a selling corporation is fully protected by the courts and now even by statute in Iowa, I do not think it should be said that the stockholder of the selling corporation in a sale of assets transaction has a personal right to a two-thirds vote or to any other particular type of vote above and beyond a simple majority. Once unanimity was left behind, it became more or less a discretionary matter of legislative determination as to just what type of vote would be required in order for a change in the corporate business to be made. This is subject only to the stockholder's ultimate, individual protection—namely, the appraisal right.

■ My conclusion is that a dissenting stockholder in Walnut Grove would not have been entitled to question, under the de facto merger doctrine, the sale of assets made by Walnut Grove and the liquidation and dissolution that followed. If this premise is correct, it seems clear to me that the warrant holders who failed to exercise their rights would be entitled to no greater protection.

As I have already pointed out, the Warrant Agreement specifically referred to two different types of situations with different effects on plaintiff's warrant

rights: A merger would not terminate his rights, but a "distribution in a liquidation, dissolution, or winding up" would do so. It must be assumed that these references were based upon the Iowa statutory provisions governing these two general types of transactions. It thus was part of plaintiff's bargain in purchasing the warrants that his rights might be ended by a distribution in accordance with those provisions. Such a distribution did take place here, so it is difficult to understand how any claim of statutory deception can be made up to this point. Plaintiff knew that his warrants would expire if they were unexercised by the specified date.

The de facto merger doctrine, as I have indicated, has been a court-fashioned remedy to protect the interests of dissenting stockholders. For me to extend the doctrine to protect plaintiff here would be to add further confusion to this body of law. It would create a strange anomaly if a warrant holder were able to secure protection for his warrant in a situation in which a stockholder, who clearly has a much more definite, identifiable interest in the continuity of his investment in the corporation, was denied relief.

Further indicating that the warrant holder's interest does not justify extension of the de facto merger doctrine is the fact that the stockholders' rights which the doctrine has protected have been statutory appraisal rights in almost all instances. The warrant holder has no such statutory rights, further suggesting that his investment is a much more uncertain, contingent interest than is the stockholder's. By simply separating the stockholder votes on the sale and dissolution proposals in this case, and by delaying the latter until after the sale was consummated, plaintiff's rights would have been terminated beyond any shadow of a doubt. The de facto merger doctrine unquestionably would not have applied. See Graeser v. Phoenix Finance Co., 218 Iowa 1112, 254 N.W. 859 (1934). The fact that the steps were approved almost simultaneously in this case can-

not be considered to have changed the nature of the warrant holder's real interest in the transaction. Accordingly, his interest is not of the sort which the doctrine has protected heretofore, and is not substantial enough to justify an extension of it now.

 For these reasons I have concluded that there is no basis for finding a violation of the statutory provisions relied upon in the complaint, so Counts II and III must be dismissed for failure to state a cause of action. Having reached this conclusion, there is no reason to consider the additional grounds urged by the defendant for the dismissal of these two counts.

I have entered an order on this date, granting defendant's motion to dismiss the complaint and dismissing the action.