**ALBERTSON'S, INC., a Delaware Corporation, et al., Plaintiffs,**

**v.**

**The AMALGAMATED SUGAR COMPANY, a Utah Corporation, and Utah-Idaho Sugar Company, a Utah Corporation, Defendants.**

**Civ. A. No. C–11–71.**

United States District Court,
D. Utah, C. D.

Sept. 10, 1973.

Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for plaintiffs.

Ray, Quinney & Nebeker, Salt Lake City, Utah, Allan M. Lipman, Jr., Ogden, Utah, Lawler, Felix & Hall, Los Angeles, Cal., for Amalgamated Sugar.

McKay, Burton, McMurray & Thurman, Salt Lake City, Utah, Pillsbury, Madison & Sutro, San Francisco, Cal., for Utah-Idaho.

## MEMORANDUM

WALTER E. HOFFMAN, District Judge, under designation.

The plaintiffs in this case, Albertson's, Inc., a retail grocery chain, Spudnut Industries, Inc., a manufacturer of doughnuts and pastries, and Fisher Baking Company, a food processor who has ceased all operations, filed a complaint in their own behalf as sugar purchasers, as well as in a representative capacity for all persons and concerns similarly situated. Compensation is sought from two beet sugar manufacturers, The Amalgamated Sugar Company (TASCO) and Utah-Idaho Sugar Company (U–I), for damages caused by alleged antitrust violations.

As set forth in the complaint, the defendants allegedly have (1) engaged in a continuous combination and conspiracy in unreasonable restraint of interstate commerce and trade, (2) attempted to monopolize and have monopolized said trade, and (3) fostered an illegal tying agreement. Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Furthermore, the defendants, through the utilization of a multiple basing point pricing system, have allegedly discriminated in price between purchasers which has adversely affected competition. Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S. C. § 13.

Class action treatment, allowable under the Federal Rules of Civil Procedure, Rule 23, 28 U.S.C.A., is sought.

The proper class is to include anyone in the "complaint area"[1] who purchased the defendants' sugar during the complaint period from January 1, 1961, to December 31, 1970. Before discussing the implications of Rule 23, it may be helpful to give certain facts which were developed by the parties at the evidentiary hearing held in February, 1973. Additionally, some explanation of "base point pricing" is essential to an understanding of the issues presented for determination.

Initially all the sugar sold in this country came from the cane sugar producers. When those companies established their refineries, the locations were carefully chosen to be near two important factors: raw material and market. Since almost all raw sugar cane comes from off-shore sources, the plants were on the seaboard and generally adjacent to a dense center of population. In so doing, the manufacturers were able to minimize their transportation costs which is a major component in the price of sugar. They sold their sugar by a delivered price, thus the price of sugar at any point in the country would be the price charged at the nearest factory plus the actual freight charge from that plant to the consumer. The nearest seaboard point of production became known as the "base point" and all other sugar manufacturers would have to meet the delivered price from the base point if they wished to sell in that area as that price represented the lowest price a quantity of sugar could move in a given locality. From its inception, then, the sugar industry has operated on a nationwide, multiple basing point pricing system.

During the latter part of the Nineteenth Century, when the beet sugar producers contemplated opening refineries in the west, they also sought to locate near the source of raw materials, namely, the beets. Since this area was sparsely populated, the potential profitability of each plant was gauged by the prevailing market price of the cane sugar. The beet producers became established in the Intermountain Northwest region (the complaint area) where the selling price of sugar was the base price of the Californian and Hawaiian Sugar Company (C&H) at that plant in or near San Francisco, California, plus the common carrier charges from that point.

In essence the beet sugar manufacturers never determined and charged any price of their own; they merely met the prevailing market price—that is, the delivered price as quoted by C&H. It can be said that there has never been any substantial price competition in the complaint area, but the evidence revealed that in all likelihood it would never exist. This is due to the uniform nature and quality of sugar and, because of same, no buyer would tolerate paying even a few cents per hundredweight more than was available elsewhere. The major aspect of competition lies in the ability of a manufacturer to satisfy unexpected needs in the shortest span. The reason behind this action would seem to be that over the years, with increased production and population, the beet sugar plants have not become a basing point, therefore the plaintiffs are not receiving any benefit from their geographic location.

Before progressing, the following terms, which are often employed in a discussion of base point pricing, need clarification:

"Base point" is the site of the nearest cane sugar producer. No reason was given as to why, in some areas at least, the beet refineries did not represent the base point other than "custom in the trade."

1. The "complaint area" is not in dispute. It consists of the States of Utah, Idaho, Washington, Western Wyoming and essentially all of Oregon other than the extreme southern portion thereof.

"Base price" means the price charged for sugar, exclusive of any freight charge, at the base point.

"Prepay" is a component of the delivered price of beet sugar and roughly equals the freight rate from C&H's plant in Crockett, California, which is the base point for the complaint area.

"Phantom freight" is a concept used by economists and the plaintiffs, but is rejected by the defendants. Phantom freight or unearned freight is present whenever the prepay charged exceeds the amount expended to actually deliver the goods. The defendants feel any figure so derived is meaningless since, in their estimation, there can be no correlation between prepay and cost of delivery. To them "prepay" has nothing whatsoever to do with delivery but is merely one of several factors used to determine their delivered price. U–I and TASCO also object to the statement that their customers *pay* phantom freight because they sell on a delivered price and do not charge any freight. Any reliance on phantom freight as a measure of damages is felt to be unwarranted by the defendants. To be meaningful, it must be assumed that the base price would remain constant if the present system were to be abandoned and such an assumption cannot be made in light of the fact that the beet producers have adopted, as their own base price, the substantially lower base price of the cane sugar producers.

"Freight pickup" is the unearned profit from and is equal to the amount of phantom freight—that is, where the prepay exceeds actual freight. "Freight absorption" is the converse situation where prepay is less than actual delivery costs and therefore represents a "loss of earnings."

Evidence was introduced which would indicate that, generally speaking, the complaint area is one of freight pickup for both defendants. Those purchasers immediately adjacent to a refinery of either U–I or TASCO are paying more for sugar than someone 200 miles away, and a great deal more than someone outside the Intermountain Northwest region who is nearer to Crockett, California. Those plaintiffs close to the plants are understandably disturbed by the feeling that they are paying more, merely to enable the defendants to compete in distant markets.

It should be noted that the pricing policies of C&H and the other cane sugar producers are not under attack in this action. They charge no phantom freight nor do they have any freight pickup. Within the context of the basing point system, since C&H determines its own base price and charges only actual delivery costs, their customers get the benefit of their geographic location. Their only possible culpability would be through some conspiracy which would allow the system to operate, and this issue is not before the court. The plaintiffs' complaint centers on the assumption that they are paying an illegally inflated price for sugar since they are in a freight pickup area.

From the outset it is imperative that the limited scope of this opinion be understood. Since no motion for summary judgment has been filed, the court is precluded from making any decision respecting the merits of the case. Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336 (10 Cir. 1973). At this stage of the proceedings, we are only concerned with fulfilling the duty imposed by Rule 23 of the Federal Rules of Civil Procedure, 28 U.S.C.A. Rule 23(c)(1), provides:

"As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained."

While we cannot dismiss any claim or deny any defense, an analysis of the issues and the nature of the proof required at trial is relevant to a determination of the propriety of class action treatment. Abercrombie v. Lum's Inc.,

345 F.Supp. 387 (S.D.Fla.1972). The issues and proof bear heavily upon the commonality or individuality of the factual and legal issues presented, which is of primary importance to any class action.

 It is generally agreed that a suit does not become a class action merely because it has been demanded in the complaint. To be maintainable as a class action it must be shown that the action satisfies all of the requirements of Rule 23(a) [2] and that it qualifies under one provision of Rule 23(b).[3] Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26 (S.D.N.Y.1972); Korn v. Franchard Corp., 456 F.2d 1206 (2 Cir. 1972). The burden rests on the party requesting the class action to convince the court that all prerequisites have been met. Clark v. Thompson, 206 F.Supp. 539 (S.D.Miss.1962), aff'd 313 F.2d 637 (5 Cir. 1963). In this case the burden rests on Albertson's and the other plaintiffs. Green v. Wolf Corp., 406 F.2d 291 (2 Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766.

 In the complaint it is alleged that the case should properly be considered as falling within Rule 23(b)(3). Assuming for the moment that a class

action lies, we would have to concur with the plaintiffs' categorization. Subparagraph (b)(1) is inappropriate in light of the suit which has been filed in the Western District of Washington on behalf of twelve plaintiffs, all of whom would be proper members of the class. This Court is without jurisdiction to order those parties to abandon their action and be joined in this court, therefore the risks to be obviated by (b)(1) are already prevalent. Subparagraph (b)(2) applies in cases where the primary relief sought is an injunction and is inappropriate where an injunction is prayed for in addition to or in aid of an action primarily for money damages. Berley v. Dreyfus & Co., 43 F.R.D. 397 (S.D.N.Y. 1967). While plaintiffs have requested an injunction, the main import of this action is for money damages as is generally the case with antitrust actions. 3B Moore's Federal Practice ¶ 23.45 [1] N. 43.

The first determination to be made under Rule 23(b)(3) is whether the questions of law and fact common to the class members predominate over questions affecting the members individually. To accomplish this, the composition of the class members must be examined.

2. *"Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." F.R.Civ.P., Rule 23(a), 28 U.S.C.A.

3. *"Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and *in addition*:
 (1) the prosecution of separate actions by or against individual members of the class would create a risk of
 (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible

standards of conduct for the party opposing the class, or
 (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
 (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
 (3) the court finds that the questions of *law or fact common to the members of the* class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." F.R.Civ.P., Rule 23(b) in part, 28 U.S.C.A.

All of the proposed members are sugar purchasers but they stand in various positions. Albertson's typifies the variety present, since they buy both directly from the defendants and indirectly through wholesalers. They also buy sugar as a consumer for use in its ice cream, breads, etc., as well as for resale purposes.

A finding of the predominance of the common issue is complicated by the presence in the same class of indirect purchasers and purchasers for resale. This is true because of the Supreme Court decision, Hanover Shoe v. United Shoe Mach., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which was a Sherman Act monopolization case. Substantial damages were awarded by the lower court and affirmed on appeal with slight modification. Before the Supreme Court the defendant, United Shoe, argued against the recovery of any damages on the ground that Hanover Shoe had sustained no injury compensable under § 4 of the Clayton Act. Since the plaintiff had not absorbed any monetary loss, but rather had passed on the overcharges to their customers, there was nothing for which they could recover. This "pass on" defense was rejected by the Supreme Court as it had been in the lower courts.

The court felt such a defense posed certain problems in its application which would be insurmountable. A determination would have to be made to see if a particular plaintiff had in fact raised his prices in response to illegal overcharges and that he would not or could not have raised his prices absent any illegality. 392 U.S. 493, 88 S.Ct. 2224. Additionally, it was feared that the public policy favoring enforcement of the antitrust laws would be thwarted because the only person with standing would be the ultimate consumer who generally has miniscule damages and little interest in even a class action. For these reasons the general rule was set forth giving the first purchaser from the wrongdoer a cause of action which, for the most part, would not be subject to any "passing on" defense.

Albertson's and the other plaintiffs in this case seek to include in their class members who were not "first purchasers" from either defendant. Their inclusion was objected to in light of *Hanover Shoe, supra,* and at a pre-trial conference on December 19, 1972, the plaintiffs agreed to exclude all *indirect* purchasers from their purpose class. Such a result would be necessary even in the absence of the consent given since, generally speaking, these individuals have no cause of action.

■■ Without making any final determination as to their standing, it can be said that, for any indirect purchaser to recover, he must prove his individual arrangements for the purchase of sugar. To allow them to remain in the class would be to create multiple trials as to liability and it is just such fragmentation of the class action which Rule 23(b)(3) is designed to prevent. City and County of Denver v. American Oil Co., 53 F.R.D. 620 (D.Colo.1971). Rule 23 is designed to aid in the more efficient administration of justice by trying many causes of action at once, but such result would be frustrated when, as here, the issues pertaining to individual plaintiffs predominate over those issues common to all class members.

With the exclusion of the indirect purchasers, the remaining members of the class—who are all *direct* purchasers—can be divided into two categories: purchasers for resale and those who use the sugar as one ingredient in some final product. U–I and TASCO object to the inclusion of the purchasers who merely resell the sugar, again relying on *Hanover Shoe.* While stating as a general rule that all direct purchasers had a cause of action, the Supreme Court recognized the possible existence of certain limited exceptions. In the case of "preexisting 'cost-plus' contracts" there would be no question that the over-

charge was passed on and, for that reason, it could be asserted as a defense. The defendants argue that every purchaser for resale could have sold on a cost-plus basis and, therefore, may have no claim. They foresee the trial deteriorating into individual mini-trials with each plaintiff having to overcome this defense.

■ We cannot concur with the defendants' contentions at this time, expressly reserving, however, the right to alter this holding at some later time as provided by Rule 23.[4] Given the extremely limited applicability of the "pass on" defense, we feel that none of the sugar purchasers would fall within the exception as we understand it and, therefore, there would be little or no danger of individual trials. Certain sugar purchasers were offered as being potentially vulnerable to the "pass on" defense. In their depositions the sugar wholesalers stated they sold on a cost-plus basis but, upon further examination, it became apparent that their fixed margin was not constant but varied with competitive pressures and market conditions. This variable fixed margin arrangement is not encompassed in the preexisting cost-plus exception of *Hanover Shoe*. This holding is by no means to be construed as a final determination of the availability of the "pass on" defense. If subsequent evidence, legal briefs and arguments show a misunderstanding as to the law or, if during discovery procedures, some sugar wholesalers do exist that are subject to the defense, we will exclude all direct purchasers who resell. Until such time, they will be considered as members of the class for all purposes.

With the inclusion of all direct purchasers and the exclusion of all indirect purchasers, it now becomes necessary to determine the propriety of class action treatment on each of the substantive claims. The complaint essentially alleges three violations: §§ 1 and 2, Sherman Act conspiracy; § 1, Sherman Act Tying Agreement; and Robinson-Patman price discrimination. Since Rule 23(c)(4)[5] authorizes a court to divide a case into separate issues, allowing a class action as to some and at the same time denying it as to others, each of the three claims will be treated independently.

Before any discussion of the requirements of Rule 23(a) and § 1, Sherman Act claim, the issues presented thereby must be defined. The primary issue presented is whether there existed any conspiracy between U–I and TASCO which fostered base point pricing in restraint of trade. Secondly, if concerted illegal action is found to exist, the extent, if any, of price inflation over that which it would have been in a freely competitive situation. There is also an allegation of an attempt to monopolize but, because of the dual defendants and market structure, this must also be based on a conspiracy to monopolize. The plaintiffs in their first count are seeking to prove a conspiracy as violative of the antitrust law and are not attacking the base point pricing system as being illegal *per se*. Absent the conspiracy, no violation of § 1 of the Sherman Act would be present. Assuming arguendo the plaintiffs prevail on this claim, their relief, in addition to money damages, would be limited to an injunction against any future conspiracy and would not go to the continuation of base point pricing.

■ Keeping the issues and available remedies in mind, we will look to the requirements of Rule 23(a),[6] all of

---

4. " . . . An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." F.R.Civ.P., Rule 23(c)(1), 28 U.S.C.A.

5. "When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues . . . and the provisions of this rule shall then be construed and applied accordingly." F.R.Civ.P., Rule 23(c)(4), 28 U.S.C.A.

6. Id., p. 49, fn. 2.

which must be satisfied. Joinder in this case would definitely be impracticable. While the exact number of class members is not known, such is not essential in order to be satisfied that the numerousness requirement has been met. Price v. Skolnik, 54 F.R.D. 261 (S.D.N.Y.1971). The evidence does reveal that the direct purchasers for resale, who are a small portion of the total class membership, number around one hundred. Even if the class were limited to this number, joinder would be inappropriate, thus the first requirement has been satisfied.

In light of the above, there can be no question but that there are issues common to the class. The only issue as to liability, the conspiracy, is common to the whole class. Also the claims of the representative parties for injuries resulting from the alleged illegal conspiracy are typically the same for the class.

Both U–I and TASCO oppose the class action on the ground that these plaintiffs would inadequately protect the interests of the class. Upon examination, their objection is founded on the assumption that the base point pricing system itself would be declared illegal, which is unwarranted with respect to this first count. Since only the conspiracy aspect is under attack and base point pricing would continue, the conflict of interest between the class members which would prevent fair and adequate representation does not exist. Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). The interests of plaintiffs are compatible and nonantagonistic with those of the absent class members and therefore representation is adequate.

■■■■■ Objection is also raised that the questions common to the whole class do not predominate as required by Rule 23(b)(3) since the damages recoverable by each plaintiff will vary. It is well settled that as long as liability can be established by common proof, a class action will not be defeated by the individual nature of the damages. Gold Strike Stamp Company v. Christensen, 436 F.2d 791 (10 Cir. 1970); Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal. 1967). The defendants seek to distinguish these cases by alleging that, while the measure of damages in those cases was constant, the measure of damages with respect to each plaintiff will vary. This argument is without merit since the damages will not equal the phantom freight paid as the plaintiff suggests, but rather will be the amount of inflation per unit caused by the conspiracy.

■■■■ While class action treatment is appropriate for count one of the complaint, different issues are presented by the alleged tying agreement which warrant separate consideration. The major issue posed by this claim is whether the delivered price paid by the plaintiffs is the equivalent of the sale of one product, the sugar, upon condition or tied to the purchase of another service, namely, freight to the customer. Each and every sale of sugar is being contested as a contract in restraint of trade, thereby violating § 1 of the Sherman Act, 15 U.S.C. § 1. If plaintiffs were to succeed on this count, the final order would enjoin all "objectionable" contracts and thereby effectively end base point pricing. Without indicating any opinion as to the strength of the plaintiffs' case, factually or legally, because the system of base point price is questioned, class action treatment must be denied.

U–I and TASCO contend that this case is at variance with those authorities where class actions have been allowed. In the ordinary instance every class member has been adversely affected by the tying agreement and each individual has the same interest in having it declared illegal. There is substantial evidence which would indicate that each of the potential class members in this case has a different and sometimes antagonistic interest in the continued maintenance of the base point pricing system. This is true even in light of

our rejection of the initial offer of proof to the effect that, if base point pricing is declared illegal, some buyers would pay more than they do now. We cannot accept this as fact since the evidence revealed that C&H and not the defendants is the price leader in the complaint area. Even Smoot, a vice-president of U–I, admitted that he could only lower the price of sugar, not raise it. Any attempt by U–I or TASCO to raise prices would simply result in the loss of customers as C&H would presumably keep its price constant. It is clear that due to the uniformity of the product, no buyer would tolerate paying even a few cents per bag more than they could pay elsewhere.

Even though the price of sugar will not be raised as a result of this litigation, conflict of interest among the class members is still present. The diversity of interest stems from the disruption of competitive relationships throughout the Intermountain Northwest region. The aim of the tying agreement allegation is to reverse the present situation where customers closer to the refineries pay more for sugar than the more distant purchasers. It is evident that, if this injustice is "rectified," the competitive position of a distant customer will be substantially changed vis-a-vis his more local competitor. The defendants introduced an exhibit which typifies the potential alteration in the current competitive relationships among class members regardless of what new base price is charged. To take the most drastic change as shown by the chart, as between purchasers at Salem, Oregon, vis-a-vis a buyer at Yakima, Washington, the net change is 69 cents per hundredweight (per bag).

The plaintiffs produced several businessmen at the evidentiary hearing who testified that their primary concern was the abolition of base point pricing regardless of any change in competitive relationships. We cannot accept this opinion as representative of the entire class because of a questionable assumption and particular facts not universally applicable to the class. These witnesses stated that their primary concern, and the concern of all businessmen, was the reduction of costs and that, without base point pricing, sugar was bound to cost substantially less. They assumed that their cost of sugar would be lowered by an amount equal to the phantom freight they now pay. If base point pricing were to be abandoned, it is clear that U–I and TASCO would have to raise their base price and not continue to charge the base price at Crockett, California, as the plaintiffs seem to believe. The evidence indicates that some new basis price would have to be set which would maintain the percentage return on capital constant with existing levels if the defendants are to stay in business.

In addition to this misinterpretation of the consequences of the action, these businessmen's position is not coextensive with all the potential class members. The sugar needs of the witnesses represented only a small fraction of their total cost of production. Any change in their competitive position would have to be less severe than, for example, between sugar wholesalers, who operate on a high volume, low profit, and where the cost of sugar is the most significant factor. It is apparent that the evidence with respect to the interests of all businessmen in the complaint area cannot be accorded any weight.

The plaintiffs have come forth with a fairly novel argument in an attempt to circumvent the problem of unequal benefits to class members resulting in changing competitive positions. They would have the court disregard the impact of their action as between the individual members, but would rather have us recognize that all class members will be benefited with respect to persons outside the Intermountain Northwest area. Even taking this as correct, the argument falls far short of convincing this court that a substantial conflict of interest in the continuation of base point

pricing does not exist between members of the proposed class.

■ With this in mind, it is important to note that, as amended in 1966, Rule 23 now provides for final determination of the rights of the absent class members. Since they will be bound by a decision in which they took no part, courts have recognized the fact that a much stricter standard for determining the adequacy of representation should be employed. Carroll v. American Federation of Musicians of U. S. & Can., 372 F.2d 155 (2 Cir. 1967). Courts have reiterated the view that the representative party must have no interest which is antagonistic to the class, but rather have interests wholly compatible with them. Troup v. McCart, 238 F.2d 289, 294 (5 Cir. 1958). In view of the potentially varying impact on each individual sugar buyer and, consequently, their differing positions with respect to base point pricing, we feel that the named plaintiffs could not adequately represent the whole class. This inability is a fatal defect in their attempt to maintain a class action since the requirement of Rule 23(a)(4) is not met.

■ · The plaintiffs argue that those members who would oppose the action would be few in number and, after adequate notice, they could exclude themselves from the class. There are two problems inherent in this argument: adequacy of notice and exclusion from the class. Regarding the power to exclude themselves, the law seems to be that Rule 23 should not become operative, and a court should not grant a class action, unless and until all the requirements of the rule have been met. Free

World Foreign Cars, Inc. v. Alfa Romeo, *supra*. Courts may not grant an improper class action and then place the burden on those with adverse interests to exclude themselves. Pomierski v. W. R. Grace & Co., 282 F.Supp. 385 (N.D. Ill.1967).

There is also difficulty with the adequacy of notice requirement of Rule 23(c)(2).[7] Without question the class can be notified of the pendency of the action and its overall purpose, but the uncertain consequences of a verdict favorable to the plaintiffs reduce the effectiveness of any notice. There is no way to predict what pricing system would replace the present basing point system; nor could the effect on a particular plaintiff vis-a-vis his competitors be accurately depicted. The purpose of the notice is to fairly inform the potential class members so that they may decide whether or not to have their claims adjudicated and this is accomplished by framing a notice which conforms with the requirements of due process. Hansberry v. Lee, *supra*. While the shortcomings inherent in this notice cannot be said to be violative of due process, they do lend support for our rejection of class action treatment on the illegal tying agreement claim.

The plaintiffs' final claim is founded upon alleged violations of § 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13.[8] Basically, there are two distinct Robinson-Patman claims which could be made in this case: primary line and secondary line. Van Camp & Sons v. American Can Co., 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 311 (1929). The "primary

---

7. "In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." F.R. Civ.P., Rule 23(c)(2), 28 U.S.C.A.

8. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, . . . to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C.A. § 13(a).

line" is that line of commerce in which the discriminator is engaged. The "secondary line" is the line of commerce in which purchasers from the discriminator are engaged in competition with other purchasers from the discriminating seller. 278 U.S. at 253, 49 S.Ct. 112.

Confusion has been generated by the vacillation of the plaintiffs between these theories of recovery. However, it is our current understanding that, for the purposes of a class action determination, the plaintiffs are only asserting a primary line claim. The evidence revealed that this secondary line case was typically ill-suited for a class action and its abandonment was essential if the plaintiffs were to prevail. The Tenth Circuit has recently allowed a class action in a secondary line case, but the unique factual situation of that case is inapplicable to this case. Gold Strike Stamp Company v. Christensen, *supra*. Plaintiffs' case is the ordinary situation in which each and every plaintiff must prove his relevant market and the injury to his competition in order to establish liability. The individual issues predominate over those issues common to the class, thus Rule 23(b)(3) is not satisfied. Bel Air Markets v. Foremost Dairies, Inc., 55 F.R.D. 538 (N.D.Cal. 1972). Since the trial as to *liability* would become a series of individual trials, the purpose of Rule 23 would be thwarted and class action would be denied as to the Robinson-Patman Act involving secondary line claims.

On the other hand, the issues common to the class would predominate in the primary line claim as presented. The plaintiffs merely wish to show price discriminations and a consequent lessening of competition between U–I, TASCO and C&H. It is suggested that once the general effect on competition has been proven, liability has been established as to all class members and the individual issues would involve merely the damage phase. Gold Strike Stamp Co. v. Christensen, *supra*. The difficul-

ty presented in allowing a class action is the same as discussed in connection with the tying agreement. By the Robinson-Patman count, base point pricing itself is under attack and, if the plaintiffs are successful, we would have to permanently enjoin the use of a basing point system. Again, because of the conflicting interest among the class members involved in such a ruling, those seeking to represent the class cannot do so adequately. The class action must be denied on the Robinson-Patman claims.

U–I and TASCO further urge the court to hold class action treatment inappropriate upon the ground that the plaintiffs lack standing to sue upon a primary line claim. While we recognize the recent ruling in Wilcox v. Commerce Bank of Kansas City, 474 F. 2d 336 (10 Cir. 1973), to the effect that frivolous and insubstantial claims must be tested by a motion for summary judgment or a motion to dismiss, the issue of standing is properly before the court at this time. We are not making any determination as to the strength or weakness of the substantive primary line claim, but we are compelled to examine the representative parties' standing because they cannot adequately represent the interests of the class unless they themselves are proper plaintiffs. Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); DiJulio v. Digicon, Inc., 339 F.Supp. 1284 (D.Md. 1972).

The law seems very clear that since a suit for treble damages is a creature of the legislature, only those who qualify under the applicable statute may bring an action, 15 U.S.C. § 15:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court. . . ."

Although treble damages were intended to benefit the public by increasing the number of agencies willing to enforce

the antitrust laws, the cause of action is personal and the plaintiff must rely upon a showing of actual damages to *his* business. Maltz v. Sax, 134 F.2d 2 (7 Cir. 1943). A private litigant is not empowered to bring suit on behalf of the public in order to secure injunctive relief against allegedly unlawful practices which harm the public interests as a whole. Burkhead v. Phillips Petroleum Co., 308 F.Supp. 120 (N.D.Cal.1970). This function is to be served by the Attorney General of the United States. United States v. Borden Co., 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954); Revere Camera Co. v. Eastman Kodak Co., 81 F.Supp. 325 (N.D.Ill.1948).

 In order to recover damages a plaintiff must show not only that the defendant violated a provision of the antitrust laws, but also that it sustained damages as a direct result thereof. New Grant-Patten Milk Co. v. Happy Valley Farms, Inc., 222 F.Supp. 319 (E. D.Tenn.1963). Plaintiffs have alleged in their complaint that U–I and TASCO have violated the provisions of § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a). This section prohibits price discrimination which tends to lessen competition. There is little question that the defendants have charged discriminatory prices under plaintiffs' liberal definition. Price discrimination is merely to effect a difference in price. F. T. C. v. Anheuser-Busch, Inc., 363 U.S. 536, 549, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960). No connotation of buccaneering is intended —just a difference in price. Guyott Co. v. Texaco, Inc., 261 F.Supp. 942 (D. Conn.1966). By the base point pricing system purchasers closer to the refineries have paid higher prices than those more distant, ergo a price discrimination.

A more difficult question posed is whether these discriminations in price have had the proscribed effect on competition. The plaintiffs claim that because of the base point pricing system, any

and all price competition between the sugar manufacturers has been nonexistent. It is important to note that the Supreme Court has recognized the fact that, because sugar is uniform in character and quality, price competition is greatly reduced even in a legitimate market. Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L. Ed. 859 (1936). The objectionable conduct in that case was not notification of price moves between competitors but the conspiracy and agreement binding all manufacturers to adhere to such announced moves. The evidence in this case thus far reveals that no contract of adherence is present in the relevant market area. Spreckles, Inc. abandoned the base point system in the Los Angeles area and no retaliatory measures were taken against it. C&H merely met the lower price and U–I and TASCO dropped out of the market, being unable to sell profitably in that area.

With the defendants' inability to compete in the Los Angeles market comes to mind the conflicts presented by the plaintiffs' position. They ask the court to declare base point pricing illegal to encourage price competition. On the other hand, if price competition is forced upon the sugar market, areas of monopolization will be created. No one will pay even a few cents per hundredweight more for sugar than is available elsewhere, thus all producers must charge the same price. With an f. o. b. system the only areas in which there will be any competition will be those areas where the freight rates from several refineries is approximately equal. Stated succinctly, the paradox is that increased *price competition* decreases the *number of competitors*.

 Let us assume that the base point pricing system itself, absent any collusion, does illegally lessen competition, the question still remains whether plaintiffs have standing to attack by means of a *primary line* Robinson-Patman case. It is evident that being the

disfavored purchasers from the defendants, they would have a *secondary line* claim, assuming the ability to prove themselves in competition with some favored purchaser and a consequent injury to their business. The standing to bring a secondary line claim does not, of itself, give standing to bring the more readily proven primary line action.[9]

Several cases have said that a primary line price discrimination suit may only be brought by individuals in competition with the defendant. Bolick-Gillman Co. v. Continental Baking Co., 206 F. Supp. 151 (D.Nev.1961), rev. on other grounds, 278 F.2d 649 (9 Cir. 1960). The plaintiffs argue that the Tenth Circuit has recognized the right of a purchaser to sue the seller on a primary line claim. Gold Strike Stamp Co. v. Christensen, *supra*. It should be noted that the court was primarily concerned with the secondary line claim, giving the primary line aspect cursory treatment with no mention of standing. The cases cited in the one brief paragraph of the opinion do not stand for the proposition of a secondary line plaintiff suing for primary line damages.

The plaintiffs also rely on a Supreme Court decision which states that if base point pricing, with its price discriminations, has primary line lessening of competition, then it is illegal, Trade Comm'n v. Cement Institute, 333 U.S. 683, 68 S. Ct. 793, 92 L.Ed. 1010 (1948). They argue that if a basing point system is a primary line violation, there must be standing to sue in the purchaser as no primary line producer-seller is injured. They are all benefited thereby. These contentions must be rejected since *Cement Institute* was an action by the Federal Trade Commission, whose function is to remedy lessened competition which injures the public in general to the same extent as though the action had been maintained by the Attorney General. Revere Camera Co. v. Eastman Kodak Co., *supra.*

As has been stated, a private litigant cannot bring suit even if there is some violation of the antitrust law without showing some injury to his business. Maltz v. Sax, *supra.* The plaintiffs claim that they have been injured by the alleged primary line violation in that they have been paying higher prices. While the amount of price discrimination may be used as the measure of damages in some cases, Fowler Manufacturing Co. v. Gorlick, 415 F.2d 1248 (9 Cir. 1969), this is not the type injury which is sought to be corrected by the Robinson-Patman Act. The Act has been interpreted by the courts to allow treble damages only to those who have suffered some diminution of their ability to compete. GAF Corporation v. Circle Floor Co., Inc., 463 F.2d 752 (2 Cir. 1972). The Tenth Circuit has recognized that competition between purchasers is essential to actionable price discrimination in a suit by a purchaser against the manufacturer. Atlas Building Prod. Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10 Cir. 1959). With the prerequisites of competition between purchasers and injury to the ability to compete, a disfavored purchaser seems to be limited to a secondary line claim.

For the reasons stated above we will have to reject the plaintiffs' contention that they have standing to raise an injury to competition in a line of commerce other than their own. We adopt the rule as stated above that, to bring a primary line suit, the plaintiffs must have been in competition with the

---

9. The intention of the plaintiffs is clear. They sought to bring the primary line claim in expectation of maintaining a class action. The proof in a primary line claim is common to the class as to liability, as opposed to the individual nature of a secondary line claim.

As evidence of their intent to bring the primary line claim because of the easy proof, they were careful to note that it was their contention, once primary line liability was proven, secondary line damages could be collected if also proven.

58

defendants. Bolick-Gillman Co. v. Continental Baking Co., *supra.*

An order may be prepared and presented granting plaintiffs' request for a class action as to count one of the complaint, and denying a class action as to the other counts. Counsel for plaintiffs will forward to counsel for defendants a proposed notice to the class and, hopefully at least, agreement may be reached as to the form of the notice.

The Court, being of the opinion that this memorandum involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order to be entered may materially advance the ultimate termination of the litigation, will, upon the request of either party, include an appropriate certification in such order.